UBS Financial Services, Inc., Appellant,
v. Levin, Tax Commr., Appellee.

[Cite as *UBS Fin. Servs., Inc. v. Levin,* 119
Ohio St.3d 286, 2008-Ohio-3821.]

(No. 2007–1129—Submitted April 23, 2008—Decided August 5, 2008.)

Pfeifer, J.

{¶ 1} UBS Financial Services, Inc., formerly known as Paine Webber, Inc., appeals from a decision of the Board of Tax Appeals ("BTA"). The BTA ruled against UBS both as to jurisdiction and on the merits.

{¶ 2} As a securities broker/dealer, UBS is subject to the "dealers in intangibles" tax ("DIT"). R.C. 5725.13. UBS asserts that it overpaid DIT based on the returns it originally filed for tax years 1999, 2000, and 2001 because it had made a legal error when it computed the percentage of its business done in Ohio. The BTA ruled that it lacked jurisdiction to grant UBS relief on this claim. However, the BTA still considered the merits of UBS's appeal, again deciding against UBS and affirming the decision of the Tax Commissioner.

{¶ 3} We disagree with the BTA's jurisdictional ruling, but we agree with its disposition of the merits issue. We therefore reverse on the jurisdictional point, but affirm the decision of the BTA on the merits.

I

{¶ 4} Ohio imposes a tax on the fair value of shares in a business that constitutes a "dealer in intangibles." The tax is imposed in lieu of other taxes typically levied on businesses in Ohio. See R.C. 5733.01(A), 5733.09, 5725.26, and 5751.01(E)(4). To determine the value of the shares, the law requires the dealer to file a "report exhibiting in detail * * * [its] resources and liabilities at the close of business on the thirty-first day of December next preceding." Former R.C. 5725.14, 1953 H.B. No. 1. (In 2001, the General Assembly amended R.C. 5725.14 for tax years beginning in or after 2003.) Fair value equals the net worth of the shares, and the tax as applied to securities dealers constitutes, in its essence, an ad valorem tax on the business of dealing in securities. The tax is imposed at a rate of eight mills on the dollar. R.C. 5707.03(D).

{¶ 5} The DIT statutes respect the limits of Ohio's taxing power by imposing the tax only on the Ohio share of the dealer's business. To determine the Ohio portion of a multistate securities business, former R.C. 5725.14 prescribed a particular factor to be applied to the total net worth of the business. During the years at issue, that factor on a statewide basis consisted of the following: the aggregate of all commissions charged plus one percent of all other receipts *in* Ohio divided by the aggregate of all commissions charged plus one percent of all other receipts *everywhere*. Former R.C. 5725.14.

{¶ 6} The specific merits issue UBS raises in this appeal is how to construe "receipts" as that term is used in the apportionment factor with respect to those transactions in which UBS sells securities as a principal on its own account. The issue is whether "receipts" refers to total proceeds of sales of securities or refers instead to the amount of "trading gain," i.e., the amount of proceeds netted against the cost of the securities.

{¶ 7} The Tax Commissioner contends that "receipts" equates in this context with trading gain, and UBS asserts the contrary position. Adopting UBS's position would greatly dilute the Ohio factor and thereby reduce the tax base, a result that would lead to a refund of most of the taxes that UBS paid for tax years 1999 through 2001. The BTA affirmed the Tax Commissioner's view, and UBS's appeal asks this court to reverse.

## II

{¶ 8} As a threshold to the merits issue lies a jurisdictional question: May a DIT taxpayer raise an issue through a petition for reassessment that reopens and modifies the tax liability originally established on the basis of the tax return? In this case, UBS filed its return using the Tax Commissioner's view of the meaning of "receipts" in the apportionment factor. Only after the Tax Commissioner had audited UBS, had ascertained an increased tax liability on other grounds, and had issued an assessment for the additional taxes owed did UBS raise the merits issue discussed above. It did so through the petition for reassessment that it filed to challenge the Tax Commissioner's finding of a deficiency. The BTA held that filing a petition for reassessment did not suffice to allow UBS to raise the receipts issue, because raising the receipts issue included the assertion that taxes UBS had paid based on its original return should be refunded. The BTA held that UBS had to avail itself of additional procedures to raise the receipts issue. We disagree.

{¶ 9} R.C. 5725.15 authorizes the Tax Commissioner to assess DIT liabilities over and above the liability reflected in the information supplied in the tax return. It adopts the procedure for doing so that is set forth in the general property-tax law, at R.C. 5711.31. Id. That section provides for the issuance of assessment notices and authorizes the person assessed in such instances to challenge the

assessment by filing a petition for reassessment. The jurisdictional issue presented calls into question the scope of the Tax Commissioner's authority in reviewing such a petition.

{¶ 10} The BTA's decision and the Tax Commissioner's brief present two different versions of the jurisdictional argument. The BTA held in effect that the Tax Commissioner had no authority to consider the receipts issue at all. The Tax Commissioner advocates a weak form of that holding: he maintains that he could consider the receipts argument as a reason to reduce the *additionally assessed liability*, but only to the extent of an offset against the amount of deficiency he had identified on audit. Under this view, the receipts argument could not reduce the original liability that had been assessed on the basis of the tax return as filed.

{¶ 11} We hold that R.C. 5711.31 does not impose a jurisdictional bar of either type. The primary reason for our holding lies in the plain terms of the statute: R.C. 5711.31 states that the "decision of the [tax] commissioner upon such petition for reassessment shall be final with respect to the assessment of all taxable property listed in the return of the taxpayer and shall constitute to that extent the final determination of the commissioner with respect to such assessment." Although this provision explicitly and directly addresses a situation that arises in the general property tax, the passage also applies to the DIT by virtue of R.C. 5725.15, which adopts R.C. 5711.31 for the DIT. In the DIT context, the language of R.C. 5711.31 necessarily implies that the proceedings initiated by a petition for reassessment should encompass all issues and claims that relate to what the taxpayer reported in its return.

{¶ 12} The BTA and the Tax Commissioner both cite our decision in *Internatl. Business Machines Corp. v. Zaino* (2002), 94 Ohio St.3d 152, 761 N.E.2d 20, but that case is not apposite. In *Internatl. Business Machines,* the Tax Commissioner issued an assessment of deficiency with respect to the liability that IBM had reported on its corporation franchise tax return. IBM filed a petition for reassessment, and in that context, it identified an error that it had made when filing its return. Although the taxpayer, IBM, was entitled to offset the deficiency assessment, we held that IBM was not entitled to a refund of taxes that it had paid with respect to its original return. In so holding, we noted that (1) the franchise tax provision at R.C. 5733.12(B) specifically authorized refund claims to be made on a prescribed form and (2) R.C. 5733.11(F) limited the amount of any refund arising under a petition for reassessment to the amount of the deficiency that the taxpayer had paid. Given the language of the statutes, IBM's failure to file the prescribed form barred a refund as to the tax liability reflected on its returns, inasmuch as IBM had not complied with a specific statute that created the avenue for obtaining refunds of franchise tax.

{¶ 13} The property-tax statutes that apply to the DIT do not contain a separate statute that explicitly authorizes refunds. The Tax Commissioner points to R.C. 5711.26, which permits a taxpayer to file an application for final assessment in the personal-property-tax context, arguing that that section is analogous to the refund provision in *Internatl. Business Machines*. The Tax Commissioner is mistaken; R.C. 5711.26 makes no explicit reference to refunds. An application for final assessment does constitute the means by which a taxpayer initiates a review of its liability when the Tax Commissioner has not assessed a deficiency, but the section does not condition entitlement to a refund on the filing of a particular form.

{¶ 14} Moreover, the language of R.C. 5711.31 does not explicitly limit refunds on a petition for reassessment to the amount of deficiency the taxpayer has paid. Instead, the language of R.C. 5711.31 encompasses the liability reflected on the original return.

{¶ 15} The Tax Commissioner also cites *Wright Aeronautical Corp. v. Glander* (1949), 151 Ohio St. 29, 38 O.O. 510, 84 N.E.2d 483, but that case is no more availing than *Internatl. Business Machines*. In *Wright Aeronautical*, the tax-payer did not raise the particular claim for refund until it appealed to the BTA. *Wright Aeronautical* at 31–32, 38 O.O. 510, 84 N.E.2d 483. Indeed, the court acknowledged as much in *Lincoln Elec. Co. v. Limbach* (1993), 66 Ohio St.3d 176, 179, 610 N.E.2d 990. By contrast, UBS in the present case advanced its interpretation of the statutory term "receipts" throughout the proceedings on the petition for reassessment.

{¶ 16} For the foregoing reasons, we hold that the petition for reassessment created jurisdiction for the plenary consideration of the receipts issue, even as that issue affects the tax liability pursuant to the tax returns as originally filed.

### III

{¶ 17} Before turning to the analysis of the merits issue, we review the pertinent evidence that the parties presented to the BTA. The testimony of UBS's witnesses established that during the relevant period, UBS was divided into two business segments: the institutional capital market division and the private-client group. To private clients, UBS supplied such services as transacting in equity securities, commodities, insurance, trusts, wrap products (i.e., managing client monies for a fee), mutual funds, and other securities transactions. The compensation UBS earned from such transactions consisted either of commissions or fees, the amount of which was typically tied to the volume of transactions. Net interest income constituted another form of income. Branch offices, such as the Ohio offices of UBS, primarily served individual and private-client customers.

{¶ 18} Broadly speaking, the record shows that UBS typically earned commissions on transactions it undertook as agent where individual or institutional clients constituted the principal in the transaction. Additionally, certain fees arose in such instances that qualified either as commissions or as "other receipts" under the statute. Next, the record shows that UBS bought and sold securities as a principal acting with respect to its own inventory, and it typically did so in the context of providing services such as underwriting and market-making. Such income would constitute "other receipts" under the statute.

{¶ 19} On the institutional capital market side, UBS served third parties primarily through its capital market site in New York City. One service in this area consisted of underwriting; when it acted as underwriter, UBS would contract with a private company to issue new securities either to the public, individual clients, or institutional clients. Those securities would be held by UBS as principal in its own inventory and sold to third parties out of that inventory. UBS realized profits from underwriting in two ways: by charging a fee for services and by posting trading profit realized from the sale of securities out of its inventory.

{¶ 20} UBS also participated in syndicating securities, which involved filing a registration statement and serving as initial buyer of securities that would then be resold on a stock exchange or other market. In those transactions, UBS might resell securities either as the agent or as the principal that owned the securities.

{¶ 21} An additional line of UBS's business lay in acting as "market maker" for securities. In these transactions, UBS made a firm commitment to buy or sell the securities at a set market price and maintained an inventory in the securities. UBS would realize profit from the gain derived from sales out of inventory, or it might collect a commission on a sale to an individual client.

{¶ 22} For his part, the Tax Commissioner presented two witnesses. First, the commissioner offered the testimony of Ray Stevens, a former senior academic fellow at the Office of Chief Accountant of the Securities and Exchange Commission and current director of the School of Accountancy at Ohio University. Stevens testified that the term "receipts" is not used in the context of financial accounting reports, but that it is used in "calculating things like cash flow," and in that context, "receipts" means "[r]evenues received in cash." With respect to "revenues," the accounting standards that apply to securities dealers differ from the familiar ones that apply to those that sell goods. With respect to a sale of goods, "revenue" means the proceeds of the sale, which are later netted against "cost of goods sold." By contrast, "revenue" for a dealer in securities refers to the trading *gain* realized from the sale of securities out of inventory—not to the total proceeds derived from selling the securities.

{¶ 23} The Tax Commissioner also presented the testimony of a long-time employee of the division of the Department of Taxation, which administers the DIT. That testimony established that the department had always regarded "receipts" in the business of securities as referring to trading gain, and he so advised taxpayers.

## IV

### A

{¶ 24} In arguing that "receipts" must mean the proceeds derived from selling securities out of its own inventory, UBS asserts that the plain language of the statute requires this result. The term "receipts" constitutes part of a definition of "gross receipts," and the word typically means the proceeds of a transaction, not the net profit derived therefrom.

{¶ 25} Responding to the plain-language argument, the Tax Commissioner argues that the plain language supports his view, not that advanced by UBS. The legal definition of "receipts," according to the commissioner, militates in favor of construing the term to mean gains rather than proceeds: "receipts" is defined as "[s]omething received; INCOME." Black's Law Dictionary (8th Ed.2004) 1296. We find that the Tax Commissioner presses this definition too far; at most, the dictionary definition indicates that the term is ambiguous, not that it plainly establishes the propriety of the Tax Commissioner's construction.

{¶ 26} Indeed, if this case involved the business of selling goods, we might find UBS's plain-language argument persuasive. But the record in this case establishes that discerning the meaning of "receipts" from plain language is not so straightforward in the context of selling securities. First, the testimony showed that when UBS sold securities as a principal, it typically did so in connection with providing underwriting, market-making, and syndication services to those who issued the securities and to others. To the extent that the proceeds of selling such securities exceeded the amounts advanced in connection with acquiring the securities, the gain on such transactions constituted a type of compensation for the services UBS rendered.

{¶ 27} This scenario differs from the sale of goods, in which a wholesaler or retailer views itself primarily as a dealer in the goods rather than as an entity engaged in providing a service to a third party. By contrast, a broker/dealer views itself as providing services to clients through the buying and selling of securities. Because, as already noted, the "trading gain" constitutes part of the broker/dealer's compensation for the services it renders, it makes sense to construe the term "receipts" in the context of a broker-dealer as the gain from selling securities, rather than as the total proceeds.

{¶ 28} We find that the record supports this view of UBS's transactions in two main respects. First, Professor Stevens's testimony shows that the applicable accounting standards reflect the difference we have just described: the revenue concept in the securities context equates to trading gain, not to proceeds derived from the sale of the securities.

{¶ 29} The second significant circumstance lies in the method UBS used to calculate its refund claims. Had this case involved a sale of goods, UBS could readily have consulted its financial statements, along with its books and records, and located a revenue figure relating to sales of the goods; UBS could then have utilized that figure as the proceeds from the sale of the goods. But that approach could not work in the context of selling securities. Instead, UBS had to *reconstruct* an amount reflecting the proceeds from the sale of securities.

{¶ 30} UBS performed this task by generating a "cost of securities inventory sold" figure for "each year under audit, both as to Ohio residents (as determined from the business generated by our Ohio sales offices) and to customers located worldwide." The testimony showed that in deriving the inventory figures, the tax manager had found it necessary to consult the "sub-schedules—the underlying schedules supporting the statement of financial condition." UBS then advocated that this reconstructed "cost" figure constituted an "additional amount" that "represents the cash received on sales of securities held in [UBS's] inventory for sale to customers." UBS demanded that this reconstructed "additional amount" be "included in both the numerator and the denominator of the receipt factor." In other words, UBS predicated its claim on reconstructing a cost figure for securities and adding that cost figure to the revenue figure for the sole purpose of pursuing refunds from the state.

{¶ 31} We hold that the circumstances just described establish that in this context, the apportionment formula's use of the term "receipts" contains an ambiguity. We therefore reject UBS's plain-language argument, and we turn to the question of how to construe the ambiguous term.

**B**

{¶ 32} To construe the ambiguous term, we must ascertain the rule of construction that we should apply. UBS urges that the apportionment formula "define[s] subjects of taxation," in which case any ambiguities must be resolved in favor of the taxpayer. *Borden, Inc. v. Limbach* (1990), 49 Ohio St.3d 240, 241, 551 N.E.2d 1268, citing *B.F. Goodrich Co. v. Peck* (1954), 161 Ohio St. 202, 53 O.O. 91, 118 N.E.2d 525, paragraph three of the syllabus.

{¶ 33} We disagree. Former R.C. 5725.14 does not define the subjects of taxation; instead, it sets forth the method for determining the Ohio share of an interstate business. Any particular construction of the apportionment formula

might cut in favor of a taxpayer in one case but against a taxpayer in the next. For example, if UBS happened to conduct its underwriting and market-making activity in Ohio, UBS's proposed construction would lead to a greater rather than a lesser tax liability than does the Tax Commissioner's construction. As a result, logic militates against applying the *Borden* principle in this context.

## C

{¶ 34} R.C. 1.49 supplies the general principles for construing an ambiguous statute. Of particular significance in this case is R.C. 1.49(F), which calls upon us to consider the "administrative construction of the statute." The Tax Commissioner presented evidence, and the BTA found, that the commissioner "has for several decades interpreted the term 'receipts' to mean the gain or losses on the transactions." Our precedent tells us that such a "long standing administration practice[ ] * * * should not be set aside unless judicial construction makes it imperative to do so." *In re Packard's Estate* (1963), 174 Ohio St. 349, 356, 22 O.O.2d 409, 189 N.E.2d 434. See also *State ex rel. Clark v. Great Lakes Constr. Co.*, 99 Ohio St.3d 320, 2003-Ohio-3802, 791 N.E.2d 974, ¶ 10 ("agency's interpretation of a statute that it has the duty to enforce will not be overturned unless the interpretation is unreasonable"). The evidence in this case establishes that the Tax Commissioner's construction of the statute is reasonable, and we therefore defer to it.

{¶ 35} Also, the Tax Commissioner's construction of the statute more closely realizes the "object sought to be attained" by the apportionment. R.C. 1.49(A). See *Rio Indal, Inc. v. Lindley* (1980), 62 Ohio St.2d 283, 285, 16 O.O.3d 326, 405 N.E.2d 291 (construing allocation provision in corporate franchise tax to achieve the objective of taxing the fair value of Ohio business); *Champion Spark Plug Co. v. Lindley* (1982), 70 Ohio St.2d 82, 85–86, 24 O.O.3d 152, 434 N.E.2d 1359. Just as former R.C. 5725.14 measures UBS's broker business by commissions, the underwriting, market-making, and syndication businesses should similarly be measured by the *compensation* UBS receives for its services—not the aggregate cash value associated with the transactions UBS handles on behalf of its clients.

## V

{¶ 36} Based on the foregoing analysis, we reverse the BTA's holding that it lacked jurisdiction to consider UBS's alternative interpretation of "receipts." We hold that the petition for reassessment in this case fully invoked the Tax Commissioner's jurisdiction to consider that issue both with respect to the deficiency assessment and with respect to the original return. On the merits, we

affirm the BTA's holding that the Tax Commissioner correctly construed and applied the apportionment statute.

Decision affirmed in part<br>and reversed in part.

MOYER, C.J., and LUNDBERG STRATTON, O'CONNOR, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

———

Varnum, Riddering, Schmidt & Howlett, L.L.P., and Thomas J. Kenney; and Baker & Hostetler, L.L.P., and Edward J. Bernert, for appellant.

Nancy Hardin Rogers, Attorney General, and Barton A. Hubbard, Assistant Attorney General, for appellee.